IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BRYAN BUSS,

        Plaintiff,

v.                                  Case No. 12-2777 JTM

UNITED OF OMAHA LIFE
INSURANCE COMPANY,

        Defendant.

MEMORANDUM AND ORDER

This case stems from the denial of continuing long-term disability insurance benefits under the terms of a disability insurance policy. The court has before it two motions for summary judgment: one by defendant United of Omaha Life Insurance Company (Dkt. 39) and the other by plaintiff Bryan Buss (Dkt. 42), each filed on February 18, 2014. The court grants Buss's motion and denies United's motion. The court begins by deeming well-supported facts not properly controverted as undisputed under Federal Rule of Civil Procedure 56.1.

## I. Undisputed Facts[1]

Plaintiff Bryan Buss is thirty-nine year old male who was employed as a Regional Marketing Manager for MedaSTAT USA, LLC, where he began working in November 2003. MedaSTAT is a healthcare information company that provides database and research services to manage the cost and quality of healthcare.

---

[1]The court relies heavily on the undisputed medical record provided by United in Dkts. 41-1 and 41-2.

*MedaSTAT's Disability Insurance Policies*

MedaSTAT allows its employees to enroll in group short-term and long-term disability plans (collectively, "the Plan"). As an employee of MedaSTAT, Buss was enrolled in the Plan at all relevant times. The Plan was insured by group short-term and long-term disability insurance policies, both issued to MedaSTAT by defendant United of Omaha Life Insurance Company and both effective May 1, 2007. United is incorporated in the State of Nebraska and authorized to do business in Kansas.

The short-term policy allows benefits to be paid for a continuous period of disability of thirteen weeks, or until benefits become payable under the long-term disability plan, whichever occurs first. The short-term policy defines "disability" and "disabled" as follows:

> Disability and Disabled means that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which You are:
>
> (a) prevented from performing at least one of the Material Duties of Your Regular Job on a part-time or full-time basis; and
>
> (b) unable to generate Current Earnings which exceed 99% of Your Weekly Earnings due to that same Injury or Sickness.
>
> Disability is determined relative to Your ability or inability to work. It is not determined by the availability of a suitable position with Your employer.

Dkt. 41-1, p. 95. Under a section titled "Authority to Interpret Policy," the policy states:

> By purchasing the policy, the Policyholder grants United of Omaha Life Insurance Company the discretion and the final authority to construe and interpret the policy. This means that United has the authority to decide all questions of eligibility and all questions regarding the amount and payment of any policy benefits within the terms of the policy as

interpreted by United. In making any decision, United may rely on the accuracy and completeness of any information furnished by the Policyholder or an insured person. United's interpretation of the policy as to the amount of benefits and eligibility shall be binding and conclusive on all persons.

The Policyholder, as Plan sponsor, agrees that the Policyholder retains full responsibility for the legal and tax status of its benefits program and releases United from all responsibility for the reporting and the employment-based design of the program and from all other responsibilities not accepted in writing by an officer of United.

*Id.* at 7.

The long-term disability policy contains the same language regarding United's discretion. *Id.* at 291. It also provides that "[b]enefits will be paid during a period of Disability until the earliest of" several different events occurs, including "the day You are no longer Disabled," "the day You fail to provide Us satisfactory proof of continuous Disability and/or any Current Earnings," and "the day You are able to return to work on a part-time or full-time basis and do not do so." *Id.* at 277. The long-term policy defines "disability" and "disabled" as follows:

Disability and Disabled means that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which You are:

(a) prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and

(b) unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.

After a Monthly Benefit has been paid for 2 years, Disability and Disabled mean You are unable to perform all of the Material Duties of any Gainful Occupation.

> Disability is determined relative to Your ability or inability to work. It is not determined by the availability of a suitable position with Your employer.

*Id.* at 293–94. The policy defines "Gainful Occupation" as a job the claimant is reasonably fit to perform and "can be expected to provide [the claimant] with Current Earnings at least equal to 85% of Basic Monthly Earnings within 12 months of [claimant's] return to work." *Id.* at 294.

<u>Buss's Medical Conditions</u>

Buss's last day of work for MedaSTAT was October 30, 2007. That same day, Buss underwent surgery on his left ankle by Dr. Harry Visser. On February 18, 2008, Dr. Ravi Yadava examined Buss as a follow-up to his surgery, noting Buss "has had a problem with narcotic abuse and was referred to [the doctor] for pain control just before his surgery." *Id.* at 169–70. Dr. Yadava said Buss "has not been compliant with instruction given by this office and needs to improve his compliance if he wants to continue to be served by this clinic," and "if he is more disciplined with his therapeutic program, he might not have the swelling in his ankle that requires injections and other techniques." *Id.* Dr. Yadava noted that "[f]urther care of [Mr. Buss's] knee will be based on results of his MRI. There are no other recommendations that I would have for him at this time. I am hopeful that he will be more compliant with instructions provided and enjoy a good result." *Id.*

Buss also sought treatment for knee pain. On April 16, 2008, Buss underwent arthroscopic surgery on his right knee. On July 13, 2008, Buss had a right knee partial arthroplasty.  On June 24, 2009, Buss underwent a whole-body bone scan which found

"moderate diffuse uptake in relation to knee joints, somewhat diffusely on the right and more in relation to the lateral compartment and patellofemoral compartment on the left. Mild to moderate diffuse uptake in relation to the left ankle joint." *Id.* at 914–15.   On September 6, 2011, Buss underwent a CT scan of his left knee, which revealed that the "lateral meniscus appears diminutive which may be related to partial meniscectomy. Otherwise no meniscal tear is identified of the left knee." *Id.* at 472. The CT also revealed "[m]oderate to severe medial and moderate lateral compartment chondrosis/osteoarthritis." *Id.*

Buss also sought treatment for back pain. On April 6, 2009, he underwent an MRI on his spine which indicated

> "mild annular disc bulge with a small focal right posterolateral disc protrusion and possible annular tear at L5-S1. In conjunction with mild prominence of the facet joints and ligamentum flavum and mild loss of the disc height, there is mild bilateral neural foraminal stenosis, right greater than left."

*Id.* at 891. On October 19, 2010, Buss underwent an MRI of his spine which found his disc height and desiccation "unchanged since previous exam," as well as "[n]o bone marrow edema or abnormal marrow signal," and found "the distal spinal cord and conus medullaris are normal and signal intensity." *Id.* at 690. The MRI also revealed "a disc bulge present with a superimposed right foraminal zone protrusion that exerts mass effect upon the S1 nerve root and the right L5 nerve root. There is a moderate right greater than left foraminal narrowing not significantly changed since the previous exam." *Id.* This lead the reviewing radiologist to conclude there was "interval

development of a right foraminal zone protrusion at L5-S1 as described above with mass effect upon the LS and S1 nerve roots on the right." *Id.*

Buss sought treatment for his back, knee and ankle pain at Millennium Pain Management from Dr. Kevin Coleman and Susan Witlich, P.A. from March 12, 2011, through August 2012. Specifically, Buss received pain medications and epidural injections, reporting varying levels of pain in his back and knees and varying levels of success of pain management.

In October 2011, he sought treatment for his back, knee and ankle pain from Dr. Robert Hagan at Plastic & Hand Surgery, a Peripheral Nerve Institute. On October 31, 2011, Dr. Hagan stated that "based on [Buss's] symptoms, their distribution, and his examination, I do not find any significant entrapment neuropathy or nerve related neuromas." *Id.* at 417. Dr. Hagan explained, "I do not currently feel that I have any surgical recommendations for him regarding nerve decompression or denervation procedures," but he believed Buss "might benefit significantly from biologic injections." *Id.* Although he had several prior surgeries, Buss had no surgical intervention between 2008 and 2012 to address his reports of back, knee and ankle pain. *Id.* at 384–87.

<u>Buss's 2007 Claim for Short-Term Disability Benefits</u>

On November 6, 2007, MedaSTAT submitted a claim on Buss's behalf for short-term disability benefits under the short-term disability policy, seeking benefits retroactively to October 30, 2007. Buss sought short-term disability benefits for his post-surgical recovery after his surgery to repair the tendons and fibular groove deepening on his left ankle. United granted Buss's claim for short-term disability benefits as of

6

October 30, 2007. Buss sought, and United granted, an extension of these benefits through February 5, 2008. Buss received all benefits available under the terms of the short-term disability policy until the thirteen-week time period expired on February 5, 2008.

*Buss's 2008Claim for Long-Term Disability Benefits*

On February 28, 2008, shortly after Buss's eligibility for short-term disability benefits expired, MedaSTAT submitted a claim on his behalf for long-term disability benefits under the long-term disability policy. United categorized Buss's "Regular Occupation" as a "Light Duty" occupation. Plaintiff received long-term disability benefits under the long-term disability policy, retroactive from February 5, 2008 until February 5, 2010, because he was not able to perform "at least one of the Material Duties of [his] Regular Occupation." *Id.* at 293–95.

On or about December 16, 2009, consultant Rebecca Bober, Physical Therapist, conducted a Functional Capacity Examination ("FCE") on Buss. Bober concluded that Buss "gave consistent, but submaximal effort" throughout the examination "due to pain complaints and fear of increasing his back pain that he would not then be able to get back under control." Dkt. 41-2, p. 1. Bober noted that "[a]ll occasional lifting was self-limited by the client due to subjective reports of increased pain despite the absence of showing normal kinesiophysical signs or objective signs of difficulty during material handling tasks." *Id.* During the FCE, Buss reported to Bober that he could independently perform "activities of daily living (ADL's) including: dressing,

grooming, bathing, and hygiene daily." *Id.* at 5. Bober evaluated Buss's "positional tolerance" in the FCE, noting that he

> "sat for 45 minutes with only a few weight changes and stood up one time to retrieve some paperwork from a different chair, however he sat on his right buttocks and his right arm resting on the arm rest causing him to sit in right tilted position. After the 45 minutes, he said he could not sit any longer due to pain and laid down on the floor. Although client sat for 45 minutes which meets the requirements for constant, due to his poor sitting posture, the evaluator determined he met the occasional category only."

*Id.* at 11. Bober concluded that Buss could occasionally stand, walk, climb stairs, reach overhead, reach floor level, stoop and kneel or half kneel. She noted "an absence of showing normal kinesiophysical signs or objective signs of difficulty during material handling tasks." *Id.* at 1.

Bober noted that Buss's results indicated "submaximal effort" on several of the tasks. For example, Buss's hand strength tests gave inconsistent results, suggesting inconsistent or incomplete effort. However, Bober also stated that "Buss tested negative on 5 of 5 Waddell's Non-Organic Signs."[2] Bober concluded that Buss was "capable of functioning in the Sedentary Physical Demand Level over an eight hour work day," based on Buss's ability to lift twenty pounds from floor to knuckle, lift ten pounds from knuckle to shoulder, lift ten pounds from floor to shoulder, and carry fifteen pounds for twenty-five feet, all on an occasional basis. United continued paying long-term disability benefits to Buss after his FCE.

---

[2]Waddell's Non-Organic Signs are used to test for "inappropriate illness behavior," or exaggerated claims of pain. In other words, although this test is not conclusive, Buss's results did not indicate that he was exaggerating his pain.

After ordering a Transferable Skills Analysis (TSA) on Buss, United consulted Amanda J. Ruhland of Stricklett & Associates Inc. on February 1, 2010, to conduct a survey to assess the labor market in Buss's geographic area. Ruhland verified wages paid for positions identified in the TSA and verified Buss's ability to perform those positions with the work restrictions previously identified. United continued to pay Buss long-term disability benefits throughout 2010.

*Buss's 2010 Claim for Social Security Disability Insurance Benefits*

On about March 15, 2010, the Social Security Administration Office of Disability Adjudication and Review determined that Buss was disabled under the terms of the Social Security Disability Insurance Act as of August 26, 2009. The Social Security Administration awarded Buss benefits of $1,535 per month beginning on February 1, 2010. The SSA considered Plaintiff's testimony, as well as the opinion of Dr. Solman set forth in a February 2010 letter, in reaching its decision.

*United Continues to Provide Buss with Long-Term Disability Benefits in February 2010*

As stated above, the long-term disability policy initially defines a claimant as "disabled" when he or she is prevented from performing at least one material duty of their regular occupation and unable to generate earnings exceeding 99% of his or her basic monthly earnings. After the claimant receives long-term disability benefits for two years, the definition of "disabled" changes, and the claimant must be "unable to perform all the Material Duties of any Gainful Occupation." This later definition of "disabled" began to apply to Buss on February 6, 2010. At that time, United determined

that Buss could not "perform all the Material Duties of any Gainful Occupation" and continued paying his long-term benefits.

On May 18, 2010, United completed an internal medical review of Buss's claim, performed by Nurse Case Manager Nancy Rosenstock RN, BSN. In her review, Rosenstock stated that "[o]verall medical records do not appear to support restrictions and limitations, which would preclude claimant from sitting up to 6 to 8 hours out of an 8 hour day and lifting up to 10 lbs. occasionally." Dkt. 41-2, p. 234. She concluded that "[b]ased on the above medical analysis, restrictions and limitations do not appear to be supported from 02/05/2010 forward." *Id.* Despite Rosenstock's conclusion, United decided to continue paying Buss's long-term disability benefits.

In a letter dated October 19, 2011, Dr. Corey Solman, Buss's orthopedic surgeon, stated that Buss had "osteoarthritis of his bilateral knees which is actually fairly severe." Dkt. 41-1, p. 475. Dr. Solman said Buss "has undergone patellofemoral arthroplasties and partial knee replacements along with several ligament reconstructions throughout the years, and is now left with disabling arthritis in both knees," and that "[h]e also has some disabling pain in his lumbar spine." *Id.* In this letter, Dr. Solman said he believed Buss could not perform a sedentary job because of his self-reported pain symptoms and his need to change positions. *Id.* at 476. Dr. Solman stated, "[i]t may seem as though Mr. Buss would be able to perform some type of sedentary duty. However, he, due to his pain, has to have frequent position changes in order to get through his day. He reports to me during his multiple office visits in the past that he sometimes is unable to get out of bed secondary to pain." *Id.*

10

United's Nurse Case Manager Beth Beumer-Anderson RN, MSA, completed a medical claim review of Buss's claim for long-term disability benefits on October 31, 2011. Based on her review, Beumer-Anderson concluded that Buss "would be capable of sitting up to 6 hours, in an 8-hour day" and thus able to perform a sedentary job. Dkt. 41-2, p. 215. Nevertheless, United again decided to continue paying Buss's long-term disability benefits.

_United Reviews Buss's Eligibility Again in 2012_

On May 4, 2012, Beumer-Anderson completed another medical claim review of Buss for United. As part of her review, Beumer-Anderson noted that she had "obtained updated medical information and is now reviewing for evidence of current work capacity . . . . Emphasis will be placed for the purposes of this referral on the more recent information submitted for review." Dkt. 41-2, p. 218. In the section of her review titled "Review of Updated Information," Beumer-Anderson reported no improvement in Buss's conditions. _Id._ at 219. Rather, she reported that Buss had a herniated disk and would proceed with a translaminar epidural steroid injection (TESI). _Id._ She also noted that Buss had radicular lumbar pain, myofascial pain syndrome and neuropathic pain, as well as unilateral dermatomal distribution of back pain that was correlated with MRI findings. _Id._ Finally, she noted that updated X-rays showed progressive worsening of Buss's knee joint degeneration. _Id._ Beumer-Anderson concluded "that the updated information obtained for the purposes of this referral fails to change the opinions expressed in the prior review of this case" that Buss "is entrenched in his perceived pain

issues rated as severe in the 8-10/10 range" and that he could perform the functions of a sedentary position. *Id.* at 220.

In response to this review, Dr. Solman wrote a letter dated May 20, 2012, opining that "for Buss to be able to perform a truly sedentary job, without the ability to move around, stand, walk, sit, and even lie down on his back or stomach, is doubtful, and in my opinion he is NOT fit for being able to take part in competitive gainful employment, regardless of its level of intensity." Dkt. 41-1, p. 387.

On May 30, 2012, Beumer-Anderson completed another medical claim review. She considered Dr. Solman's letter, but downplayed his conclusions as merely "a reflection of what [Buss] is relating to him." Dkt. 41-2, p. 223.

*Transferrable Skills Analysis*

On June 21, 2012, Vocational Consultant Douglas Palmer performed a TSA to determine what, if any, occupations Buss was qualified to perform, other than the occupation he was performing at the time of his disability. Palmer noted that "his opinions are independent of any claims decisions or the referring agency. I have encountered no conflicts of interest in the performance of this review." Dkt. 41-2, p. 310. Palmer concluded that Buss was qualified to perform the following sedentary occupations with the associated monthly wage: Sales Manager—$5,820.00; Advertising Manager—$5,820.00; Merchandise Manager—$4,920.00. All of these wages were within the gainful occupation income percentage of Buss's pre-disability monthly wage as defined in the policy.

Palmer listed the documents he used in preparing the TSA. This list reveals that Palmer's TSA was based on labor market surveys, a TSA, an occupational analysis, and a note by Beumer-Anderson, all of which were completed before June 2010. The list also includes Dr. Solman's letter dated May 20, 2012, which did not contain medical documents but simply stated Solman's disagreement that Buss could perform a sedentary job. In other words, Palmer's TSA relied on reviews of medical information that was more than two years old.

*July 2012 Denial of Buss's Long-Term Disability Benefits*

In a letter dated July 16, 2012, United notified Buss that he was not approved for continued benefits beyond July 10, 2012, under the long-term disability policy. In the letter, United listed the information used to make its determination:

a. Buss's Long-Term Disability claim form attending physician's statement by Dr. Solman, Orthopedic Surgery, dated December 19, 2011

b. Medical records from Dr. Corey Solman dated September 6, 2011 – October 19, 2011

c. CT Scan of Buss's left knee dated September 6, 2011

d. Consultation with Dr. Robert Hagen, Orthopedics, dated October 31, 2011

e. Medical records from Millennium Pain Management with Dr. Kevin Coleman and Physician's Assistant Susan Witlich, dated July 15, 2011 – December 9, 2011

f. Medical consultant review of Buss's file dated May 4, 2012 and May 30, 2012

g. Clarification letter to Dr. Solman dated May 10, 2012

h. Clarification response from Dr. Solman dated May 20, 2012

i. Vocational Consultant occupational analysis of Buss's job description dated March 17, 2009

j. TSA completed by vocational consultant dated June 21, 2012.

Dkt. 41-1, p. 366. In its letter, United explained, "[w]hile our review takes into consideration all of your available medical records, we place an emphasis on the most recent medical information available, as we have already reviewed your prior medical information and determined you were eligible to receive disability benefits." *Id.* United further explained that "[i]n order to qualify for continued disability benefits, you must remain totally disabled from any Gainful Occupation according to your policy. In order to determine this, we monitor your prognosis through the life of your claim." *Id.* United also notified Buss that it had reviewed his medical records, including Dr. Solman's letter dated May 10, 2012, and found that there was a lack of objective medical evidence to support Buss's continued disability under the long-term disability policy. *Id.* at 368. United explained that "[a]ccording to our review, you have continued complaints of pain regarding your knees and lumbar back; however this would not prevent you from performing a Sedentary occupation" and that Buss "would be limited in [his] ability to stand and walk for a total of up to 1 hour each in an 8 hour day broken up into 10 to 15 minute periods, and [he] would likely require positional changes throughout [his] workday." *Id.* at 367. United further stated that the medical records did not contain any evidence, other than Buss's self-reported symptoms, that Buss had positional intolerance. *Id.* at 368.

At the time of Buss's original disability claim on October 30, 2007, he was earning a pre-disability monthly wage of $5,240.05. United determined that his gainful occupation wage was $4,454.04, which is 85% of his pre-disability wage. In its letter denying Buss's benefits, United stated

> The medical documentation fails to substantiate a condition or conditions that would render you totally disabled from any Gainful Occupation and Dr. Solman was unable to provide additional medical documentation to support any restrictions and limitations that would prevent you from being capable of performing a Sedentary occupation. We have been able to identify and also documented our findings of Gainful Occupations with a physical demand of sedentary. These occupations also meet the necessary gainful wage, 85% of your pre-disability wages, and these occupations exist in your local economy. Therefore, no benefits are payable beyond July 10, 2012.

*Id.* at 369.

<u>United's Review of Buss's Appeal</u>

Buss appealed United's decision in a letter received by United on July 20, 2012. United requested pharmacy records from Buss and notified him that it sought updated records from Dr. Solman, Dr. Coleman and Dr. Visser in order to fully evaluate his appeal. On August 29, 2012, United completed a medical claim review of Buss's claim for long-term disability benefits, which was performed by Nurse Case Manager Julie Grancer, RN, CCM.

In her review, Grancer noted that Buss's medical examination on August 7, 2012, showed normal blood pressure, pulse and respiration readings, "which are not indicative of severe pain." Dkt. 41-2, p. 229. Grancer also noted that Buss showed no suggestion of a cognitive deficit during his exam, despite his being prescribed narcotics,

and he was alert and oriented to person, place and time. *Id.* Grancer also found that Buss was in no acute distress, and his recent and past memory seemed appropriate as testing revealed his ability to recall past and present particulars of his medical history, and his reasoning and judgment seemed normal. *Id.* In concluding her review, Grancer stated that "[i]n my opinion as of current, [Buss] would be capable of sitting 6 hours out of an 8-hour day, occasional lifting up to 20 pounds and frequently 10 pounds. He would need the ability to make routine alternating position change with standing/walking." *Id.*

By letter dated September 13, 2012, United denied Buss's appeal for long-term disability benefits under the long-term disability policy. In its letter, United listed the information used to make its determination:

a. Buss's Long-Term Disability claim form

b. Buss's job description

c. Records of Dr. Corey Solman, Orthopedic Surgery, dated September 6, 2011 – June 20, 2012

d. Letters from Dr. Corey Solman dated May 20, 2012 and August 1, 2012

e. Records of Dr. Steven Granberg, Anesthesiology, dated July 5, 2012

f. Records of Dr. Robert Hagan, Plastic Surgery and Hand Surgery, dated October 31, 2011

g. Records of Dr. Kevin Coleman, Anesthesiology, dated February 3, 2012—August 7, 2012

h. Records of Dr. Harry Visser, Podiatrist, dated July 17, 2012

i. The FCE by Rebecca Bober, Physical Therapist, dated December 16, 2009

16

j. Buss's undated appeal letter, received by United July 20, 2012

k. The Occupational Analysis by Kim Rhen, Rehabilitation Coordinator, March 16, 2009

l. Buss's Pharmacy Records

m. The TSA by Kim Rhen, Rehabilitation Coordinator, dated January 8, 2010

n. United's internal medical reviews dated January 7, 2008, October 30, 2009, December 29, 2009, May 18, 2010, October 31, 2011, May 4, 2012, and August 29, 2012.

Dkt. 41-1, p. 312. In the same letter, United explained to Plaintiff that, "[t]he medical evidence supports restrictions and limitations through July 10, 2012," but that "the medical evidence must support continuous disability during and beyond July 10, 2012, for benefits to continue to be payable." *Id.* at 313. United further explained that its review was "looking at [Buss's] ability to perform any gainful occupation," and that United "recognize[d] that [Buss] was being treated for right knee, right foot pain and bilateral ankle pain; however, these medical issues do not preclude [him] from being able to sit 6 hours out of an 8 hour day, occasionally lift 20 pounds and frequently lift 10 pounds." *Id.* As of September 13, 2012, Buss had "exhausted all administrative rights to appeal." *Id.*

<u>*United's Efforts to Prevent an Internal Conflict of Interest*</u>

United makes aggressive efforts to fairly review the claims under the group employee benefit plans it insures, without regard to the manner in which the plan is funded. United pays claims consistently and in accordance with the applicable benefit

provisions. United's employees who make decisions regarding the claims of ERISA plan participants are paid fixed salaries that are wholly unrelated to the amount or number of claims paid or denied. United's employees are not provided benefits, bonuses, commissions, promotions, or any other incentives—financial or otherwise—based on the number of benefit claims that they approve or deny. United does not establish numerical guidelines or quotas regarding claim payments or claim denials.

Nor are employees are evaluated on the basis of the amount or number of claims paid or denied. United's employees are evaluated, in part, on the quality of their claim decisions, in other words, whether the claims were handled correctly in accordance with the applicable plan documents. Employees are also evaluated on the timeliness and accuracy of their claim decisions.

United maintains a separate appeal unit for the consideration of denied claims on appeal. Employees in United's appeal unit are charged with making an independent assessment of the claim decision based on all of the evidence in the claim file. Neither the claims department nor the appeal unit has any role or responsibility in the management, reporting, or other functions regarding United's finances.

The claims department and appeal unit are completely separate business units from the financial underwriters. Neither the claim department nor the appeal unit is required to seek approval from financial underwriters for claim decisions. The financial underwriters do not advise or influence the claim department or appeal unit with respect to whether or not to pay a claim. Neither the office of the chief financial officer of United, nor any of the individuals who report to him, are involved in claim decisions.

18

United pays consultants and third parties hired to assist in the claim review process, but it does not pay extra for consultants or third parties to render decisions resulting in a denial of claims. United pays consultants and third parties the same rate independent of their ultimate decisions.

## II. Legal Standard – Motion for Summary Judgment

Summary judgment is not a disfavored procedural shortcut, but rather an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); FED. R. CIV. P. 1. Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit." *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id*.

In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hosp.*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Nat. Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove the nonmovant's claim; it need only establish that the factual allegations have no legal

significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987). To negate summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

## III. Analysis

### A. Standard of Review

The court must first decide the appropriate standard of review to apply to United's decision to terminate Buss's long-term disability benefits. *See Weber v. GE Group Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008). Buss argues that the court should review United's decision under a *de novo* standard; United argues that the court must review its decision under an arbitrary and capricious standard.

"A denial of benefits challenged under ERISA is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Benson v. Hartford Life and Accident Ins. Co.*, 511 Fed. App'x 680, 683 (10th Cir. 2013) (internal quotation marks and citation omitted). When the plan gives the administrator discretionary authority, the court employs a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious. *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment and Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010). This standard is also called the "abuse of discretion" standard. *See Chambers v. Family Health Plan Corp.*, 100 F.3d 818, 825 n.1 (10th Cir. 1996). Under the arbitrary and capricious standard, the court's review is limited to determining whether the interpretation of the plan was reasonable and made in good faith. *LaAsmar*, 605 F.3d

at 796. The party arguing for the more deferential standard of review bears the burden of establishing that the court should review its benefits decision under an arbitrary and capricious standard. *Id.*

In this case, the long-term disability policy unambiguously states that United has "the discretion and final authority to construe and interpret the policy," including "the authority to decide all questions of eligibility and . . . the amount and payment of any policy benefits within the terms of the policy as interpreted by United." The court finds that this language gives United the discretionary authority to determine eligibility for benefits and construe the terms of the plan. Accordingly, United has met its burden establishing that the court should apply the deferential standard of review.

Buss does not contest that the plan contains this discretionary language, but he maintains that the court should use a *de novo* standard of review. First, Buss argues that United has a conflict of interest because it acts in a dual role, both evaluating and paying claims. Buss appears to argue that this conflict of interest modifies the standard of review from arbitrary and capricious to a "combination-of-factors" standard of review.

A conflict of interest should be weighed as a factor in determining whether there is an abuse of discretion, rather than changing the standard of review from deferential to *de novo* review. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115 (2008). The "combination-of-factors" is merely the *method* of review, rather than a standard. *See id.* at 118. In other words, the court searches for an arbitrary and capricious abuse of discretion, taking into account the conflict of interest and its effect on the decision of the

21

administrator. This does not change the deferential standard of review the court employs.

Buss also argues that *de novo* review is appropriate because of certain procedural irregularities in United's termination of benefits. "To be entitled to deferential review, not only must the administrator be given discretion by the plan, but the administrator's decision in a given case must be a valid exercise of that discretion." *Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 631 (10th Cir. 2003). Procedural irregularities in the administrator's decision can result in application of the *de novo* standard. For example, "when substantial violations of ERISA deadlines result in the claim's being automatically deemed denied on review, the district court must review the denial *de novo,* even if the plan administrator has discretionary authority to decide claims." *Id.*

The first irregularity asserted by Buss is that United did not fully investigate his claims because it failed to employ a physician to review his claim during the four-year administration of benefits. Buss argues that United's failure to hire a physician to review his claim warrants application of the *de novo* standard. Buss admits that he could not find legal precedent for this argument, but he considers the absence of case law a natural consequence of "such a rare instance." Buss cites *Derksen v. CAN Group Life Assurance Co.*, 2005 WL 3542878, No. Civ. 04-3411(MJD/SRN), at *12 (D. Minn. Nov. 8, 2005) for the general proposition that physician review is enforced strictly. In *Derksen*, the court reviewed the administrator's decision *de novo* after determining that the administrator did not conduct an independent medical review after Derkson appealed the initial denial of benefits. 2005 WL 3542878 at *11. In *Derkson*, unlike in the present

case, *no* medical review was performed on appeal. In this case, Registered Nurses Nancy Rosenstock and Beth Beumer-Anderson performed medical reviews of Buss's claims before the initial denial of benefits, and Registered Nurse Julie Grancer performed a medical review for Buss's appeal.

Buss argues that a physician must perform the medical reviews necessary in this process, but this is not a statutory requirement. "The relevant definition provides that '[t]he term 'health care professional' means a physician or *other health care professional* licensed, accredited, or certified to perform specified health services consistent with State law.' " *Bess v. Mut. of Omaha Ins. Co.*, 2011 WL 5858815, Civil Action No. 2:11-00143, at *10 (S.D. W.Va. Nov. 22, 2011) (quoting § 2560.503–1(m)(7)) (emphasis added). "The language used manifests a broad intent to encompass health care personnel such as registered nurses, and no evidence suggests that the nurses who reviewed plaintiff's appeals were unlicensed or otherwise unqualified under state law." *Id.* As in *Bess*, Buss fails to attack the credentials or independence of his medical reviewers—other than complaining that they are not physicians. Registered nurses fit the requirement of a "health care professional," and the court has no facts before it suggesting that the nurses in this case performed anything but qualified and independent medical reviews of Buss's claims.

Buss also argues that United failed to gather relevant evidence. Specifically, Buss argues that United: (1) failed to evaluate Buss in person, despite the recommendations of its employee reviewers; (2) failed to obtain an updated FCE in order to assess Buss's current functioning at the time benefits were denied and during the appeal process; and

(3) improperly used the outdated and invalid FCE results to create an invalid labor market survey and an invalid TSA and considered those results as evidence supporting termination of benefits. The court finds these arguments unpersuasive because Buss provides no legal basis to justify changing the standard of review.

Buss cites *Kimber v. Thikoil Corp.*, 196 F.3d 1092 (10th Cir. 1999) to support his argument that a failure to gather relevant evidence warrants *de novo* review. But the court in *Kimber* held no such thing. In *Kimber*, the plaintiff argued that the deference due to a plan administrator is decreased when the administrator fails to gather or examine relevant evidence. 196 F.3d at 1097. The plaintiff advanced this argument in the context of a failure to gather evidence as a result of the defendant's inherent conflict of interest. The court opined that this was "arguably [an] accurate statement[] of law," citing *McGraw v. Prudential Ins. Co.*, 137 F.3d 1253, 1262–63 (10th Cir. 1998), but found that the argument did not apply. *Id.* Further, the court in *Kimber* made clear that the standard "always remains arbitrary and capricious but the amount of deference present may decrease 'on a sliding scale in proportion to the extent of conflict present, recognizing the arbitrary and capricious standard is inherently flexible.' " *Id.* (quoting *McGraw*, 137 F.3d at 1258). Additionally, in *McGraw*, after recognizing the failure of the administrator to do a full review of the plaintiff's medical records, the court applied the arbitrary-and-capricious standard, giving less deference to the administrator's decision "to the degree necessary to neutralize any untoward influence resulting from the conflict." 137 F.3d at 1263 (internal quotation marks and citation omitted).

The court holds that the arbitrary and capricious standard is appropriate here. Following the procedure employed by the Tenth Circuit in *McGraw*, the court will assess these alleged defects in United's decision, modifying the deference appropriately.

*B. Review of United's Decision to Terminate Buss's Long-Term Disability Benefits*

The court "will uphold the decision of the plan administrator so long as it is predicated on a reasoned basis, and there is no requirement that the basis relied upon be the only logical one or even the superlative one." *Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey*, 663 F.3d 1124, 1134 (10th Cir. 2011). Generally, the court will "look for substantial evidence in the record to support the administrator's conclusion, meaning more than a scintilla of evidence that a reasonable mind could accept as sufficient to support a conclusion." *Id.* (internal quotation marks omitted). The court first addresses United's conflict of interest.

Conflict of Interest

The court recognizes United's inherent conflict of interest, as the administrator is responsible for both determining which claims should be paid and paying those claims. "A plan administrator acting in a dual role, i.e., both evaluating and paying claims, has such a conflict of interest." *Foster v. PPG Indus. Inc.*, 693 F.3d 1226, 1232 (10th Cir. 2012) (citing *Glenn*, 554 U.S. at 112). However, the court also recognizes that the existence of a conflict of interest is less important than the effect the conflict has on the decisionmaking process, if any. The conflict of interest "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims

25

administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Glenn*, 554 U.S. at 117.

As detailed above, United took many steps to neutralize its inherent conflict of interest in this case. It separates its claim reviewers from its financial underwriters, and the financial underwriters do not influence the decisions of the claim reviewers about whether to pay a claim. United's claim reviewers are separated into initial claims review and appeal review units, which are independent of each other and play no role in management, reporting, or other financial functions of the company. United evaluates its claim reviewers on the quality of their claim decision, including timeliness and accuracy of the decisions. United does not tie its claim reviewers' pay, benefits or performance reviews to the number of claims paid or denied. United pays consultants to assist in the review of claims, but it pays for the consultants' services at the same rate regardless of the outcome of their decisions. Additionally, Buss has provided no facts in support of his contention that United's conflict of interest played a role in the decision to terminate his benefits. The court is not persuaded that United's conflict of interest affected its decision in this case. Accordingly, the court reviews United's denial of benefits under a "pure" arbitrary and capricious standard. *See Eugene S.*, 663 F.3d at 1133.

Definition of "Disability/Disabled"

Next, the court addresses the definition of "disability/disabled" in United's long-term disability policy. At the time United denied Buss's benefits, the policy defined the

26

terms as follows: "Disability and Disabled mean You are unable to perform all of the Material Duties of any Gainful Occupation." The parties interpret this definition differently.

United argues that this provision unambiguously requires a claimant to be unable to perform *any* material duty of any gainful occupation to qualify as disabled. In other words, if the claimant can perform a single duty of any one of the many gainful occupations available, he or she is not disabled. United argues that the policy gives it the authority to construe the terms, and it has consistently communicated this definition to Buss. On August 5, 2009, United sent Buss a letter to notify him of the upcoming definition change that would apply to him if benefits should continue beyond February 5, 2010. *See* Dkt. 41-2, p. 93. But the letter merely stated that Buss must be "unable to perform all the Material Duties of any Gainful Occupation . . . ." *Id.* This phrasing is nearly identical to the policy, and sheds no light on how to interpret it.

Buss argues that he qualifies under the policy's definition of disabled so long as no gainful occupation exists for which he is able to perform all material duties. In other words, if an occupation has twenty material duties and Buss is only able to perform nineteen of them, he would still be "unable to perform all of the Material Duties" of this job. And if Buss cannot perform every single material duty of any gainful occupation, then he would be disabled under this interpretation of the policy.

The court recognizes a patent ambiguity in the policy's definition of disability. On its face, being "unable to perform all of the Material Duties" can be interpreted two ways. A person who is able to perform nineteen out of twenty material duties is

27

"unable to perform *all* of the Material Duties" of the job. A person who is unable to perform *any* material duty of an occupation—i.e., the ability to perform zero of twenty material duties—is also "unable to perform all of the Material Duties."

Although both interpretations are reasonable views of the language, the one argued for by United would lead to absurd results. Under United's interpretation, a claimant would literally have to show that he is unable to perform every material duty of every available job. Buss's own former occupation lists the following as a material duty: "practice positive customer relations and maintain client confidentiality at all times." Dkt. 41-2, p. 177. As a result, anyone with a friendly personality and the ability to keep a secret cannot be considered disabled, even if they are paralyzed from the neck down.

The interpretation of this definition is immaterial, as the court's analysis ultimately concludes that United's decision was arbitrary regardless of which interpretation applies. For this reason, the court does not issue a holding on which interpretation must prevail. The court discusses the competing interpretations only to point out that the policy lacks the clarity that United presumes it has.

<u>Arbitrariness of United's Decision to Terminate Buss's Benefits</u>

As it concluded above, the court reviews United's decision to deny long-term disability benefits under the deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious. *See Eugene S.*, 663 F.3d at 1130. "Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of

law, bad faith and conflict of interest by the fiduciary." *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1282 (10th Cir. 2002).

United maintains that its decision denying Buss long-term disability benefits was reasonable because Buss failed to present satisfactory evidence that he was totally disabled. The court is unpersuaded by United's position. As the court explains below, United simply had no new evidence since its last review of Buss's claims that would justify changing its decision that Buss was disabled. After previously granting Buss long-term disability benefits on essentially the same information, United's reversal was arbitrary and capricious, as it had no new information showing an improvement in Buss's condition.

As United correctly argues, Buss was required to provide evidence to United that he was disabled under the policy. The undisputed facts show that United decided Buss had done just that from October 30, 2007, when Buss's short-term disability benefits began, to July 10, 2012, when United cut off Buss's long-term disability benefits. On February 6, 2010, a new definition of disability applied to Buss. Under this definition, Buss had to show United that he was "unable to perform all of the Material Duties of any Gainful Occupation . . . ." Dkt. 41-2, p. 93. United considered Buss to have shown adequate evidence of disability under this definition from February 6, 2010 to July 10, 2012. That United denied Buss's disability after July 10, 2012, shows that United moved the goalposts on what evidence it required to consider Buss disabled, as the court explains below.

In an attempt to nullify that it had consistently considered Buss disabled, United argues that its medical reviews always questioned the validity of Buss's claim for long-term disability benefits and believed that he could perform a sedentary position. Often, actions speak louder than words. Although United's medical reviewers consistently stated that they believed Buss was not disabled, United consistently continued to consider Buss disabled, as it continued to pay him long-term disability benefits. United's decision to stop paying Buss's benefits clearly shows that it simply changed its mind one day. The court searches for substantial evidence supporting United's decision.

An administrator is not prevented "from denying benefits when the administrator becomes aware of new information about the claimant's eligibility for benefits." *Williams v. Metro. Life Ins. Co.*, 459 Fed. App'x 719, 731 (10th Cir. 2012). However, the medical review performed by Beumer-Anderson in 2012 contained no new information since her last review in late 2011 that would justify United changing its decision to pay Buss's benefits. "[U]nless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments." *Id.* (internal quotation marks and citation omitted).

United considered Buss disabled after Rosenstock's internal review on May 18, 2010, despite her conclusion that Buss's medical records did not support his total disability and inability to sit up to six hours in an eight-hour day and occasionally lift ten pounds. *See* Dkt. 41-1, p. 547. United again considered Buss disabled after Beumer-Anderson completed her medical review on October 31, 2011, even though her

30

conclusions were the same as Rosenstock's had been the year before. *See* Dkt. 41-2, p.
215. United terminated Buss's benefits only after Beumer-Anderson's medical review
dated May 4, 2012. The court looks for new evidence in the 2012 review that would
support United's change of heart but comes up empty-handed.

In her 2012 review, Beumer-Anderson began her conclusions with the statement:
"It is the opinion of this reviewer that the updated information obtained for the
purposes of this referral, fails to change the opinions expressed in the prior review on
this case by this author, dated 10/31/11." Dkt. 41-2, p. 220. The court assesses Beumer-
Anderson's reference to "updated information." In the section labeled "Review of
Updated Information," Beumer-Anderson noted that Buss "has a right sided herniated
disk," and that he will "proceed with translaminar epidural steroid injection (TESI),"
which he received in November and December. Dkt. 41-2, p. 219. She noted that Dr.
Coleman opined Buss had "unilateral dermatomal distribution of back pain that is
correlated with the MRI findings." *Id.*  She stated that "updated X-rays have shown
progressive worsening of his knee joint degeneration." *Id.* In the medical analysis
section, Beumer-Anderson's only update from her previous analysis was a note on
Buss's newly-diagnosed myofascial pain syndrome. She stated, in relevant part, that
"[m]yofacial pain syndrome has different meanings to different health care providers. It
refers to any regional pain disorder that seems to emanate from the soft tissues (muscle,
tendon, ligament, or connective tissue)." *Id.* at 220. In other words, since her last review,
Buss's back pain was consistent with the evidence from his MRI, X-rays showed that his
knee joint was getting worse, and he had been diagnosed with a new condition. None of

the updated information cited by Beumer-Anderson shows any improvement in Buss's condition.

United argues that Buss failed to provide any new medical evidence in 2011 and 2012 that would support his disability. This is simply incorrect. For example, in her review dated October 31, 2011, Beumer-Anderson refers to X-rays of Buss's right and left foot performed on July 15, 2011, as well as a CT scan on his left knee from September 6, 2011. The X-rays showed degenerative changes in both feet, and the CT showed "moderated to severe midline and moderate lateral compartmental chondrosis and OA and patella-femoral arthroplasty." Dkt. 41-2, p. 214. In her review on May 4, 2012, Beumer-Anderson listed the updated information analyzed by the court above. Again, none of this updated information provided any basis to find improvement in Buss's condition or pain.

United also insists (somewhat contradicting its previous argument) that Beumer-Anderson relied on updated medical information in her review, which United in turn relied upon in terminating Buss's benefits. United supports this argument by citing to Beumer-Anderson's review where she wrote, "The analyst has obtained updated medical information and . . . . [e]mphasis will be placed for the purposes of this referral on the more recent information submitted for review." Dkt. 41-2, p. 218. But United fails to point to the new medical information that Beumer-Anderson reviewed.

United argues that Beumer-Anderson noted Buss was "neurovascularly intact" in her medical review on May 4, 2012. But this statement was also included in her medical review on October 31, 2011, so it is not new information. *See* Dkt. 41-2, p. 214.

United also argues that it sought medical records from Dr. Solman that would support his opinion that Buss was disabled, but Dr. Solman failed to provide these. This does not reflect new information that provides a basis justifying a change in United's disability determination.

United continues this line of argument, burnishing the fact that on appeal, Buss's medical examination on August 7, 2012, indicated a normal blood pressure, pulse and respiration rate, which were not indicative of severe pain. This, also, is not new information. Treatment notes from his July 15, 2011 visit to Millennium Pain Management reflect a normal blood pressure and regular heart rate. Nonetheless, United continued to consider Buss disabled after Beumer-Anderson's review on October 31, 2011, which incorporated this information.

United further argues that the primary basis of its decision was Buss's inability to provide objective evidence to support his level of impairment. But as the medical reviews reveal, Buss had provided the same amount of objective evidence before, and United had considered him disabled. United downplays Buss's pain complaints—and Dr. Solman's interpretation of those complaints—as subjective and unreliable. But United's evidence for not believing the severity of Buss's pain comes from the 2009 FCE, wherein the evaluator opined that Buss was giving "submaximal effort." The evaluator's opinion is subjective too, as well as being several years old and, thus, not new information.

United's decision that Buss's medical records and performance on occupational evaluations do not support a finding of disability would perhaps be a reasonable one in

a vacuum. But considering United's previous decisions that Buss was disabled under the same information, the reversal is not reasonable. Determining a person to be disabled one day and not disabled the next day upon review of the same information fits the very definition of arbitrary. To be clear, the court would not require insurers to get their disability decision right the first time upon penalty of forever being stuck with that conclusion. Rather, the court requires that an insurer must show substantial evidence to support changing its disability determination, as it must do to support its initial decision.

No reasonable finder of fact could find substantial evidence justifying United's decision to terminate Buss's long-term disability benefits after July 10, 2012. Accordingly, the court grants summary judgment to Buss.

IT IS THEREFORE ORDERED this 4th day of September, 2014, that Bryan Buss's Motion for Summary Judgment (Dkt. 42) is granted.

IT IS ALSO ORDERED that United of Omaha's Motion for Summary Judgment (Dkt. 39) is denied.

s/J. Thomas Marten
J. THOMAS MARTEN,
CHIEF JUDGE